**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION**

**CIVIL ACTION NO. 04-554-JBC**

**ASHLAND, INC. d/b/a THE VALVOLINE CO.,**                          **PLAINTIFF,**

**V.**                          **MEMORANDUM OPINION AND ORDER**

**WINDWARD PETROLEUM, INC., ET AL.,**                          **DEFENDANTS.**

**\* \* \* \* \* \* \* \* \* \***

This matter is before the court on the plaintiff's motion for summary judgment on the defendants' counterclaims (DE 69), the defendants' motion for partial summary judgment on the plaintiff's claims (DE 70), and the defendants' motion for leave to file excess pages (DE 83). The court, having reviewed the record and being otherwise sufficiently advised, will grant the plaintiff's motion for summary judgment in part and deny it in part; grant the defendants' motion for summary judgment in part and deny it in part; and grant the defendants' motion for leave.

**I. Factual Background**

The plaintiff, Ashland, Inc. d/b/a The Valvoline Co. ("Valvoline"), is a Kentucky corporation engaged in the business of marketing, distributing, and producing automotive and industrial products and services. The defendant, Windward Petroleum, Inc., is a Delaware corporation, with its principal place of business in New Hampshire, and is a distributor of automotive and industrial products and services. The defendant, Commercial Distributing, Inc. ("CDI"), is an

Oklahoma corporation and is also a distributor of automotive and industrial products and services.  The two defendants (sometimes collectively referred to as "Windward") are held under common control, with Windward acting as a distributor in the Northeast and CDI operating in the Oklahoma region.

The parties' dispute in this case focuses on a series of contracts they entered into relating to the distribution and marketing of Valvoline products.[1]  In 1992 and 1999, CDI and Windward, respectively, signed distributor agreements with Valvoline.  These agreements provided that the defendants would purchase a set amount of Valvoline products during the term of the contract.  The distributor agreements also required the defendants to use their best efforts to promote and sell Valvoline products and prohibited them from soliciting the conversion or failing to resist the conversion of Valvoline customers to a competitor of Valvoline.  These distributor agreements were terminable by either party, with or without cause, at any time upon ninety (90) days' written notice.  At the time these agreements were entered into, the defendants also allegedly signed bulk sales agreements which required the defendants to purchase bulk quantities of Valvoline products within the

---

[1]Prior to October 11, 1999, Bailey Distributing Corporation ("Bailey") was a distributor of automotive products, including Valvoline products, in the northeastern United States.  On that date, Windward acquired certain assets and obligations of Bailey, including many of the contract rights and duties at issue in this case.  For the purposes of simplicity, any contractual rights or liabilities assumed by Windward as a result of the Bailey acquisition will be referred to as obligations of Windward without regard to whether they were acquired from Bailey.

twelve-month terms of the contracts.[2]  These bulk sales agreements expressly incorporated the terms of the distributor agreements, including the provision for termination upon 90 days' written notice.

Pursuant to the distributor agreements, the defendants also signed a number of three-party supply agreements, the particulars of which require some explanation.  When distributors such as Windward purchase products from providers like Valvoline, they typically sell some or all of these products to consumers such as oil-change outlets.  These customers are referred to in the industry as installers.  These installer/distributor sales may take place without any pre-existing contractual arrangement, but typically the provider, the distributor, and the installer will enter into agreements under which the installer agrees to purchase a certain amount of product from the distributor for a set period of time.  Valvoline and Windward, along with a number of installers, entered into approximately 150 of these supply agreements.  The agreements provided that, if Windward ceased to be an authorized Valvoline distributor, then Windward would be required to assign its rights and obligations, without the installer's consent, to Valvoline.  These agreements also allowed termination by the installer on 90 days' written notice and provided that Valvoline could "change and/or cancel" the "programs" at any time, without prior notice.  In addition to these three-party agreements, Valvoline also entered into several two-party supply contracts between it and customer/installers.

---

[2]The defendant Windward has, in its second amended answer, denied entering into any such bulk sales agreement with Valvoline.

As a part of the distributor agreements, Valvoline loans funds to its distributors for the acquisition of oil installation and vehicle maintenance equipment; the distributors in turn loan the equipment purchased with these funds to the installers.  Valvoline is granted a security interest in the equipment purchased with the loaned funds.  This arrangement is referred to as the Valvoline Loan Equipment Program.  The defendants have executed several such loans with Valvoline.  Under the terms of the supply agreements, however, the installers are required to return the equipment to Valvoline or purchase it from the distributor upon termination of the supply agreements.

On October 13, 2004, representatives of Valvoline and Windward met for the purported purpose of reformulating the parties' business relationship.  The plaintiff maintains that Windward orally advised it that Windward and CDI were terminating their distributorship with Valvoline and that they would switch their installers to Exxon-Mobil in the coming months.  Valvoline also states that Windward did not provide Valvoline with written notice of this termination and that Windward and CDI began persuading their customers to purchase Exxon-Mobil products in December of 2004, before the 90-day notice-of-termination period had passed.

On December 13, 2004, the plaintiff filed its complaint in this court, alleging various state law claims against the defendants.  First, Valvoline claimed that Windward and CDI breached the distributor and bulk sales agreements by failing to

4

pay the plaintiff for Valvoline products provided under those contracts, failing to exercise their best efforts to market Valvoline products, soliciting to convert Valvoline customers to competitors of Valvoline, failing to give written notice of termination, and delivering non-Valvoline products as Valvoline products.  Second, the plaintiff claimed the defendants breached the supply agreements by failing to assign their contracts to Valvoline as required.  Third, the plaintiff claimed it was entitled to the repayment of unpaid sums on the Valvoline Loan Equipment Program loans. Finally, Valvoline asserts a claim for tortious interference with Valvoline's supply agreements and Valvoline's advantageous business relationships based on the defendants' alleged attempts to persuade Valvoline's installers to buy the products of Valvoline's competitors, in breach of the installers' contracts with Valvoline.  On September 15, 2005, Valvoline amended its complaint to state claims for conversion against each of the defendants, claiming that Windward and CDI improperly withheld funds that had been designated for repayment to Valvoline.

Along with its answer, Windward raised new factual allegations and pleaded several counterclaims against Valvoline.  Windward first claims that, pursuant to the supply agreements, it provided customer/installers with loans on behalf of Valvoline to purchase equipment or with the equipment itself. Windward contends that, when it requested reimbursement from Valvoline for these advances, Valvoline was continually delinquent in making such payments.  The defendants further claim

5

that Valvoline refused to compensate them for equipment provided to Valvoline's "national account customers" to retain these customers' accounts. Based on these alleged non-payments, the defendants have counterclaimed for breach of the supply contract and quantum meruit/unjust enrichment. The defendants also state that Valvoline engaged in inequitable price discrimination by dealing with its Valvoline Instant Oil Change ("VIOC") outlets on terms more favorable than those offered to Windward. Finally, Windward requests relief based on Valvoline's alleged failure to compensate the defendants for sums they were owed under Valvoline's Distributor Incentive Fund ("DIF") program.[3]

### II. Standard of Review

In determining a motion for summary judgment, the Court must determine that there are "no genuine issues as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986). A court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial.

---

[3]The defendants originally asserted a claim for promissory estoppel as well, which has since been withdrawn. *See* Defendants' Response to Plaintiff's Seventh Set of Discovery Requests, p. 5 at Request #2.

6

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The significant question is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-53 (1986).

The moving party has the burden of showing there is an absence of evidence

to support a claim. *Id.* at 324-25. After the movant carries that burden, the non-

moving party must go beyond the pleadings to designate by affidavits, depositions,

answers to interrogatories, and admissions on file specific facts showing that there

is a genuine issue of material fact for trial. *Id.* If the non-movant completely fails

to prove an essential element of its case, then all other facts are rendered

immaterial. *Id.* at 322-23.

**III. Legal Analysis**

On May 4, 2006, both Valvoline and Windward filed motions for summary

judgment. Windward claims it is entitled to summary judgment on Valvoline's

claims for breach of the supply agreements, interference with contract rights and

advantageous business relationships, and conversion. The defendants also move

for partial summary judgment on the plaintiff's claim for breach of the distributor

agreements. Valvoline has requested summary judgment in its favor on all of the

defendants' counterclaims.

At the same time the defendants filed their reply to Valvoline's response to

7

the defendants' motion for summary judgment, the defendants also filed a motion for leave to file excess pages in their reply brief.  Local Rule ("LR") 7.1(d) provides that reply briefs are to be no longer than 15 pages; the defendants' reply brief was 23 pages.  Although Windward claims that these excess pages were needed to counter the complex arguments raised in Valvoline's response, Valvoline opines that Windward's reply was used to raise damages arguments that were not presented in the defendants' motion for summary judgment.  Because the court finds that the plaintiff was not prejudiced by the defendants' exceeding of the page limit imposed by LR 7.1(d), it will grant the defendants' motion for leave.  However, the court also reminds the defendants that the page limits imposed by the Local Rules serve important purposes.  For example, these limits deter the repetition of arguments already stated in a motion and the raising of new arguments to which an opponent has no opportunity to respond.  The court therefore directs the defendants to comply with LR 7.1(d) in its future motion practice before the court.

*A. The Defendants' Summary Judgment Motion*

*i. The Alleged Illusory Nature of the Supply and Distributor Agreements*

The defendants first argue that both the distributor agreements and the supply agreements lack mutuality of obligation and that they are therefore entitled to partial summary judgment on Valvoline's breach of contract claims.  The construction and interpretation of a contract are questions of law to be decided by the court.  *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105 (Ky. 2003).  As the

agreements provide that they were made in Kentucky and are to be governed by Kentucky law, the court will apply Kentucky law in analyzing them.

Mutuality of obligation is an essential element of a contract, and if one party is not bound, neither is bound. *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997). The crucial question in determining mutuality is whether the nature of the unilateral option is such that the party to whom it is granted has in actuality no fixed obligations under the contract. *David Roth's Sons, Inc. v. Wright & Taylor, Inc.*, 343 S.W.2d 389, 391 (Ky. 1961). Mutuality does not require that parties to a contract have reciprocal rights of the same kind or nature. *Ligon v. Parr*, 471 S.W.2d 1, 4 (Ky. 1971).

The distributor agreement signed by the parties provides that Windward was required to purchase from Valvoline "not less than 1,250,000 gallons" of Valvoline products. Although the agreement does not explicitly impose a duty on Valvoline to supply these goods, it would defy logic to find a duty on the part of a buyer to purchase without a corresponding obligation on a seller to provide products to be purchased. Indeed, this sensible result has precedent in Kentucky contract law. *See Heidelberg Brewing Co. v. E.F. Prichard Co.*, 180 S.W.2d 849, 852 (Ky. 1944) (holding that a promise to accept and pay for quantities of ale delivered to buyer would be implied though contract provided only for an obligation on the part of seller to deliver it). The court holds that the promise by Windward to buy product from Valvoline similarly implied a promise on Valvoline's part to provide said

9

product, creating the required mutuality of obligation.

Even if this were not the case, Kentucky courts have held that a contract is not void for lack of mutuality if a party not bound thereby nevertheless has complied with or performed its conditions. *See Lang v. Jones*, 433 S.W.2d 888, 889 (Ky. 1968); *Johnson v. Int'l Shoe Co.*, 15 S.W.2d 270, 271 (Ky. 1929) ("[I]f [a contract void for lack of mutuality is] acted upon and executed in whole or in part, the liability and obligations arising out of such performance [are] enforceable."). Windward does not dispute that Valvoline delivered its products according to the terms of the distributor contracts. As this is the case, Windward's obligations under the contract were valid and enforceable even if the agreements lacked mutuality.

Windward points to various clauses in the distributor agreement that purportedly give Valvoline the right to avoid its performance under the contract, thus rendering Valvoline's contractual duties illusory. Specifically, the defendants cite paragraphs 9(e), 11, 14(b), 15, and 20 of the distributor agreement as destroying the mutuality of obligation in that contract. The defendants' arguments must fail. Paragraphs 9(e), 11, and 15 provide Valvoline flexibility in determining the type of products delivered, the price charged for those products, and the allocation of products in the event of a shortage; they do not alter Valvoline's obligation to provide goods to Windward. Paragraph 20, a straightforward cap on damages, similarly does not affect Valvoline's contractual duty to perform. Finally,

10

while paragraph 14(b) does give Valvoline the right to suspend the sale of its products to Windward, this provision is conditioned on the financial status of Windward; it does not give Valvoline the unfettered power to cancel the contract. Since the defendants have not shown that the plaintiff was not bound under the distributor agreement, the court holds that that contract is not void for lack of mutuality.

The defendants' mutuality argument regarding the supply contract is similarly unavailing. Every supply contract signed by the parties to this case states, below the signatures of the parties, "[t]he Valvoline Company reserves the right to change and/or cancel these programs at any time without prior notice." Windward argues that this clause gives Valvoline the right to terminate the supply contracts at any time, thereby rendering them void for lack of mutuality. Valvoline claims that this statement was intended only to inform the parties to the contract that it could not rely on Valvoline to make future loans beyond those made in the agreement. The court is persuaded by Valvoline's interpretation, particularly since the supply agreement is referred to as the "agreement," not by the term "program," in its text. In any event, Kentucky courts have held that any part of a commercial writing appearing below the signature line does not become part of the contract. *See Consolidated Aluminum Corp. v. Krieger*, 710 S.W.2d 869, 872 (Ky. Ct. App. 1986). As the provision in question here is written below the signature line, it is not part of the contract and thus cannot render the contract void.

The court holds that neither the supply contract nor the distributor contract is void for want of mutuality of obligation.

### ii. Limitation of Damages to 90-Day Notice Period

Under Kentucky law, a party damaged by another's breach of contract is entitled to an award sufficient to place that party in the position he would enjoy if the contract had been fulfilled. *Batson v. Clark*, 980 S.W.2d 566, 577 (Ky. Ct. App. 1998).  When, however, it is the failure to give reasonable notice of termination rather than the termination itself which constitutes a breach of contract, the damages must be limited to that failure. *Pharo Distrib. Co. v. Stahl*, 782 S.W.2d 635, 639 (Ky. Ct. App. 1989).  The damages must not reflect the loss of a contract or discontinuance of a business relationship but must be limited to those elements directly relating to the lack of notice and the lost opportunity for a plaintiff to "put his house in order." *Id.; see also O'Hara v. Graham,* 166 S.W. 233, 234 (Ky. 1914).

Relying on *Pharo* and *O'Hara*, Windward asserts that, because it failed to provide the 90-day notice of termination required by the distributor and supply agreements, Valvoline's claims for contractual damages must be limited to its lost profits during this 90-day window.  Had Valvoline's breach-of-contract claims been based *solely* on Windward's failure to give notice, the court would be inclined to agree with Windward.  However, Valvoline has asserted numerous breaches of the supply and distributor agreements by Windward in addition to lack of notice of

12

termination, including its failure to assign its rights under the supply agreements and its failure to use its best efforts to promote Valvoline products as required by the distributor agreements. *Pharo* and *O'Hara* dealt with situations in which the only breach of contract alleged by the plaintiff was the failure to give proper notice. Those cases did not purport to cap a plaintiff's damages for any other type of breach.

To limit Valvoline's total damages for breach of contract based solely on a restriction implied by law for a failure to give notice would be both illogical and unfair.  Therefore, the court will deny the defendants' motion to confine the plaintiff's contract damages to the 90-day notice period.

### iii. Valvoline's Conversion Claims

Counts VII and VIII of Valvoline's complaint allege claims against the defendants for conversion.  Under Kentucky law, two of the elements a plaintiff must prove to succeed on a conversion claim are its legal title to the converted property and possession, or right to possession, at the time of the conversion. *See Meade v. Richardson Fuel, Inc.*, 166 S.W.3d 55, 58 (Ky. Ct. App. 2005).  Valvoline asserts that Windward represented to Valvoline's customer/installers that they owed a debt to Valvoline.  Windward allegedly then loaned funds to the customer/installers but withheld amounts it claimed were necessary to pay off the customer/installers' debts to Valvoline.  According to Valvoline's employees, however, Windward never paid these withheld funds over to Valvoline.  Valvoline's

13

argument, then, is that it had an ownership interest in these funds since they were specifically held for their benefit by Windward, a claim that Windward disputes.

Under Kentucky law, money is property that is capable of being converted. *Hearn v. Commonwealth*, 80 S.W.3d 432, 435 (Ky. 2002). While no Kentucky court has addressed the precise issue in this case, courts in other jurisdictions have held that a claim for conversion has been allowed where the funds in question were specific or sequestered, identifiable monies or funds entrusted to the defendant's care for a specific purpose. *Eva v. Midwest Nat'l Mortgage Bank, Inc.,* 143 F. Supp. 2d 862, 897 (N.D. Ohio 2001); *see also Estate of Jackson v. Phillips Petroleum Co.,* 676 F. Supp. 1142, 1146-47 (S.D. Ala. 1987). On the other hand, a conversion claim will not lie when the sole property right alleged to have been converted is the contractual right to compensation, not payment for the conversion of a specific asset. *Davis v. Siemens Med. Solutions USA, Inc.,* 399 F. Supp. 2d 785, 801 (W.D. Ky. 2005).

While the defendants' arguments on this point are not unpersuasive, the court finds that the reasoning in *Eva* and *Jackson* is more applicable to the facts of this case. Valvoline was originally entitled to payment from the customer/installers; its contractual right to compensation was thus from the customer/installers, not Windward. If Valvoline were seeking to mount a conversion claim against these customers, then the court would agree that *Davis* would be controlling. But when a third party informs a debtor that it may discharge a debt to a creditor by paying

14

the third party, an action for conversion by the creditor will lie against the third party for recovery of the pledged funds.  Were this not the case, the creditor would be forced to sue the debtor for the full amount it was owed, leaving the debtor to recover the wrongfully remitted payments made to the third party by way of an action for fraud or misrepresentation.  Judicial economy is best served by allowing Valvoline's conversion action against Windward.

As Valvoline has stated a claim for conversion against the defendants and presented evidence sufficient to create a genuine issue of fact on that claim, the court will deny the defendants' motion for summary judgment on counts VII and VIII of the plaintiff's complaint.

### iv. Valvoline's Tortious Interference Claims

The defendants claim that they are entitled to summary judgment on Valvoline's tortious interference claims because: (1) their conduct was not wrongful; (2) Valvoline may not claim tortious interference with a prospective contractual advantage when such claim stems from an existing contractual relationship; and (3) a claim for interference with contractual relations cannot be brought against a signatory to an existing contract.

Under Kentucky law, the tort of interference with prospective contractual relations requires the party seeking recovery to present evidence of malice or some significantly wrongful conduct.  *Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 859 (Ky. 1988).  A party may not recover under this theory absent

proof that a defendant improperly interfered with his prospective contractual relation.  *Id.* at 858.  Malice may be inferred by proof of lack of justification.  *Id.* at 859.

In the present case, Windward claims that it was entitled to induce installer/customers to purchase Exxon-Mobil products because those customers had contracts that were terminable at will upon 90 days' notice and because such conversion practices are merely normal competitive practices in the industry. Valvoline responds that Windward's breach of its own contracts with Valvoline and Windward's alleged misrepresentations to certain installer/customers to the effect that Windward would turn over release payments by the customers to Valvoline establish the requisite wrongfulness on the part of the defendants.  Since "misrepresentations are also ordinarily a wrongful means of interference," Restatement (Second) of Torts § 767, Valvoline's affidavits to that effect are sufficient to create a genuine issue of fact as to the wrongfulness of the defendants' interference.

Windward correctly argues that a cause of action for interference with prospective economic advantage cannot be maintained when the defendant's only alleged interference is with an existing contract.  *See* Restatement (Second) of Torts § 766B cmt. a ("This section is concerned only with intentional interference to prospective contractual relations, not yet reduced to contract."); *see also CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1080 (W.D. Ky. 1995) ("§ 766B . . .

16

reflect[s] the prevailing law in Kentucky.").  The plaintiff does not dispute this point but states that its claim of tortious interference with prospective advantage is justified with respect to those customers who were not a party to any contractual relations with Valvoline at the time of coercion.  The court agrees that tortious interference with advantageous business relationships is the proper cause of action to bring against a party who interferes with a plaintiff's relationship with its longstanding customers.  Accordingly, the court will grant Windward's motion for summary judgment on the plaintiff's tortious interference with prospective advantage claim as to those customer/installers who were under supply agreements with Valvoline at the time of their alleged conversion by Windward.  The defendants' motion will be denied, however, as to Valvoline's customers not under long-term contracts when Windward contacted them, as genuine issues of fact exist as to whether Windward interfered with Valvoline's relationships with those parties.

Finally, the defendants are also correct in asserting that a party cannot interfere with the performance of its own existing contract.  *See Rawlings v. Breit*, 2005 WL 1415356, at *3 (Ky. Ct. App. June 17, 2005) (holding that a defendant could not be held liable for interference with his own contract); *Tractor and Farm Supply, Inc. v. Ford New Holland, Inc.*, 898 F. Supp. 1198, 1207 (W.D. Ky. 1995) (holding that interference with contractual relationship claim could not be maintained when alleged interference would cause defendant to interfere with its

17

own prospective economic benefit; any remedy against the defendant was contractual in nature). Valvoline does not dispute the applicable law but contends that it does not affect the validity of Valvoline's interference claims regarding the many two-party contracts entered into between only Valvoline and particular customer/installers. Valvoline's point is well-taken; clearly, the rule that a party cannot interfere with its own contract would have no effect on contracts to which Windward was not a party. Thus, Windward's motion for summary judgment will be denied as to those two-party contracts.

The plaintiff also claims that Windward was not technically a party to even the three-party agreements at the time it interfered with them. The plaintiff reasons that, when Windward terminated its distributorship, it ceased its participation in the supply agreements; these agreements were then between Valvoline, the customer/installer, and a newly appointed distributor. This argument, however, is inconsistent with Valvoline's allegations that Windward continued to be bound by the terms of the distributor agreement for the 90-day period after it first provided notice of its termination. Valvoline cannot logically claim that the defendants were subject to the terms of the distributor agreement while also claiming that they were not Valvoline distributors. Because the purported conversions of Valvoline's customer/installers occurred when Valvoline claims Windward was subject to the distributor agreement, the court finds that the alleged interference by the defendants occurred when they were parties to the three-party

18

supply contracts.  Thus, the court will grant the defendants' motion for summary judgment on the plaintiff's claims for tortious interference with contract as to the three-party supply agreements and deny the defendants' motion as to the two-party agreements.

To summarize, the court will grant the defendants' motion for summary judgment on Valvoline's claims for tortious interference with its advantageous business relationships insofar as those claims extend to the defendants' alleged conversion of the plaintiff's customers who had a present contract with Valvoline at the time of the conversion.  The court will also grant the defendants' motion for summary judgment on Valvoline's claims for tortious interference with its contractual relations insofar as those claims extend to the three-party supply agreements between Valvoline, the defendants, and the customer/installers.  The remainder of the defendants' motion to dismiss Counts V and VI of Valvoline's complaint will be denied.

### B. Valvoline's Motion for Summary Judgment

As previously noted, Valvoline moves for summary judgment on all of the defendants' counterclaims.  Instead of seeking summary judgment on each *count* of the counterclaim individually, Valvoline bases its motion on the defendants' alleged failure to produce evidence that the defendants are entitled to any *damages* on their counterclaims.  During discovery, the defendants claimed damages from Valvoline based on three different sources: (1) $575,000, representing the amounts owed by

19

the plaintiff pursuant to the parties' agreements or as a result of loans made by the defendants to customers on behalf of Valvoline; (2) $223,927, representing DIF payments earned by Windward; and (3) unliquidated losses incurred as a result of the price differential between VIOC outlets and the defendants.  The court will consider each of the plaintiff's arguments in turn.

　　　　*i. DIF Payments*

　　　　Valvoline claims that the DIF payment earned by Windward was actually credited to Windward and cannot form the basis of a claim for damages in this case.  In support, Valvoline cites the deposition testimony of Andrew Welcher, President and CEO of Windward, to the effect that he believed the DIF claim had been "resolved."  Valvoline has also presented a statement showing that Windward received credit for the full amount of its DIF claim.  Windward, however, points to the affidavit of Lou DeMaio, Vice President of Sales for Windward, which states that Windward has not, in fact, been paid or credited for its DIF payment.  The court is hard-pressed to imagine a more blatant example of an issue of fact. Because all such issues are to be decided in favor of the non-moving party on a motion for summary judgment, the court will deny Valvoline's motion as to the DIF payment.

　　　　*ii. Amounts Claimed Based on Loans to Customers and Agreements*

　　　　As an initial matter, Windward concedes in its response that its claims for loans to installers must fail.  Valvoline argues that Windward's claim for amounts

due under the parties' agreements is also fatally flawed because Windward did not sufficiently quantify or categorize the amounts it claimed as damages during discovery. Windward responds that it did provide documents detailing its damages claims and that it explained these allegations to Valvoline in a meeting that occurred in the Summer of 2005. Windward also clearly states in its response that it demands $444,441 in contractual damages. Once again, the defendants have presented a genuine issue of fact as to whether their damages claims were adequately developed. Even if this were not the case, the court would be hesitant to grant Valvoline's motion for summary judgment on this ground, as none of the cases cited by Valvoline deal with the issue of proving damages. They merely recite boilerplate language to the effect that a party may not rely on conclusory allegations to survive summary judgment.

Valvoline also contends that it is entitled to setoff amounts that it is owed by Windward against Windward's damages claims for breach of the parties' contracts. As noted in the discussion of the DIF claim, the court finds that genuine issues of fact pertain to amounts Windward owes to Valvoline and therefore refuses to issue any order granting the plaintiff this right at this time.

### iii. Price Differential Claim

The defendants' final claim for damages is based on the price discrepancy between the amounts charged to Valvoline's VIOC outlets and those charged to distributors like Windward. Valvoline challenges this claim on the grounds that it is

inadequately supported, both in terms of the amount of damages Windward might be entitled to and the substantive legal basis for Valvoline's liability as a result of the differential.

The court agrees with Valvoline.  Windward has simply not advanced a sufficient legal basis to justify holding Valvoline liable for any amounts it lost as a result of the alleged price differential.  Indeed, no mention of the price difference is made in any of Windward's claims for relief in Counts I-III[4] of its Second Amended Answer and Counterclaims, and the court is unable to determine how evidence of price discrimination would support a claim for damages under the causes of action alleged.  The only claim such evidence could remotely support would be Windward's claim for breach of the covenant of good faith and fair dealing.  Under Kentucky law, however, the implied covenant of good faith does not prevent a party from exercising its contractual rights.  *Hunt Enters., Inc. v. John Deere Indus. Equip. Co.*, 18 F. Supp. 2d 697, 700 (W.D. Ky. 1997).  Windward has not alerted the court to any provision in the contracts signed by the parties here that would preclude Valvoline from charging disparate prices to different customers, and the court can find no such provision.  As this is the case, the court is constrained to find that Valvoline is not liable for any damages to Windward based on the alleged price differential.

In its response to Valvoline's motion for summary judgment, Windward for

---

[4]As noted earlier, Count IV (Promissory Estoppel) has been withdrawn.

22

the first time asserts that the price differential charged by Valvoline violated the Robinson-Patman Act, 15 U.S.C. § 13.  The plaintiff objects to this argument by Windward on the ground that it is improper to raise a new legal argument at the summary judgment stage.  The Sixth Circuit recently considered a similar issue.  In *Tucker v. Union of Needletrades, Indus., and Textile Employees*, 407 F.3d 784 (6th Cir. 2005), the plaintiff argued that the district court erred in failing to consider a claim for promissory estoppel which she had not raised until her response to the defendant's motion for summary judgment.  *Id.* at 788.  The Court of Appeals held that the claim had been properly rejected since, although the facts necessary to plead her omitted claim were within the plaintiff's knowledge, she had failed to timely amend her complaint when she learned of those facts.  *Id.* at 789.  In doing so, the court stated that, "to permit a plaintiff to [assert a new claim at the summary judgment stage] would subject defendants to unfair surprise."  *Id.* at 788.

In this case, Windward was clearly aware of the price discrepancy between the prices charged it and VIOC when it filed its first answer on September 29, 2005, since it presented these factual allegations in that pleading.  Moreover, Windward could have raised the alleged Robinson-Patman violation when it filed its amended answer and counterclaims on March 7, 2006, nearly two months before Valvoline filed the current motion for summary judgment, but it chose not to do so. Instead, Windward waited until its response to Valvoline's motion, which response was filed only two months before the scheduled date for a pretrial conference, to

raise a legally and factually complex antitrust claim for the first time.  The court finds *Tucker* to be nearly indistinguishable from the facts of the case at hand.  At the very least, the circumstances in this case present exactly the kind of unfair surprise the result in *Tucker* was intended to prevent.  Thus, the court refuses to consider the defendants' claim that Valvoline violated the Robinson-Patman Act and reaffirms its finding that the defendant is barred from seeking damages as a result of the price differential claimed by Windward.

### iv. Summary of the Court's Rulings on Valvoline's Motion

Given the slightly unorthodox nature of Valvoline's motion for summary judgment, the court will explain its final rulings on Valvoline's motion in some detail.  The court will grant the plaintiff's motion to the extent that any claims are hereby barred for damages relating to loans made by the defendants to customers on behalf of Valvoline; or the alleged price differential between amounts charged to VIOC outlets and Windward for Valvoline products.

Since Count I of the defendants' counterclaims apparently relates only to loans made to customer/installers by Windward, the court will order a judgment in favor of Valvoline on that count.  Counts II and III, however, relate to causes of action as to which Windward has asserted colorable claims for damages.  Thus, the court will grant summary judgment in favor of the plaintiff on those Counts only insofar as they purport to seek damages based on Windward's price differential claims and loan claims.

24

**IV. Conclusion**

Accordingly, the court being advised, **IT IS ORDERED** as follows:

(1)     The defendants' motion for partial summary judgment (DE 70) is

**PARTIALLY GRANTED**, to the extent that: (a) Valvoline's claims for

tortious interference with its advantageous business relationships as to

the plaintiff's customers who had a contract with Valvoline at the time

of the conversion are **DISMISSED**; and (b) Valvoline's claims for

tortious interference with its contractual relations insofar as those

claims extend to the three-party supply agreements between Valvoline,

the defendants, and the customer/installers are **DISMISSED**.  The

remainder of the defendants' motion is **DENIED**.

(2)     The plaintiff's motion for summary judgment (DE 69) is **PARTIALLY**

**GRANTED**, to the extent that: (a) Count I of the defendants'

counterclaims is **DISMISSED**; and (b) Counts II and III of the

defendants' counterclaims, insofar as they claim damages based on

the price differential alleged by Windward and loans made by

Windward to customer/installers, are **DISMISSED**.  The remainder of

the plaintiff's motion is **DENIED**.

(3)     The defendants' motion for leave to file excess pages (DE 83) is

**GRANTED**.

25

Signed on July 11, 2006

*Jennifer B. Coffman*

JENNIFER B. COFFMAN, JUDGE
U.S. DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY